IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS COURTHOUSE

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>SABRA DIPPING COMPANY, LLC,<br><br>　　　　　　Defendant. | Case No. 7:23-cv-1796<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Hartford Fire Insurance Company ("Hartford"), through its counsel, files this Complaint for Declaratory Judgment against Defendant Sabra Dipping Company, LLC ("Sabra"), showing this Court as follows:

## INTRODUCTION

1. Hartford brings this action under 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57 to obtain a declaration of the parties' rights and obligations under an insurance policy issued by Hartford to Sabra ("the Policy").

2. Sabra makes hummus, and it found a water leak at its hummus-production facility ("the Plant") on April 1, 2022. Hartford has paid to repair the Plant. Hartford has also advanced tens of millions of dollars to Sabra following Sabra's assertions that it lost income. And by August 23, 2022, Sabra fully reopened the Plant and could operate it at full capacity.

3. Sabra contends that Hartford still owes money because its hummus production and income have not returned to 2021 levels. In effect, Sabra's position is that Hartford must pretend that the water leak is the only thing that happened to Sabra.

4. But the facts say otherwise. In reality, Sabra is experiencing the effects of events

1

and circumstances that have nothing to do with the water leak. For instance, in December 2021, the United States Food and Drug Administration warned Sabra about unsanitary conditions at the Plant. So Sabra shut down the Plant for days. When it resumed production in January 2022, its output was limited as a result of new cleaning and testing protocols that created "bottlenecks" in production. Sabra then shut down *again* in March 2022 after more contamination concerns. Retail stores do not want empty shelves, so when Sabra made less hummus, stores bought and sold more hummus from Sabra's competitors, and Sabra lost market share. All of this occurred—and was ongoing—before the water leak.

5. Sabra's insurance policy from Hartford does not cover loss of market share, though. In fact, that contract says that Hartford will not pay for loss of Business Income after Sabra repairs physical loss or damage to its property, resumes operations, and is able to operate at full capacity—which means that Sabra is not entitled to any Business Income coverage after August 23, 2022.

6. Again, **Harford has already paid tens of millions of dollars** to Sabra. Hartford now asks this Court to declare that Hartford has no further coverage obligations for the Claim and that Hartford has, in fact, *overpaid* Sabra.

## THE PARTIES

7. Plaintiff Hartford Fire Insurance Company is a corporation organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut. Hartford is therefore a citizen of Connecticut. Hartford is not a citizen of Delaware, Texas, or New York.

8. Defendant Sabra Dipping Company, LLC is a limited liability company organized under the laws of Delaware with its principal place of business located at 777 Westchester Avenue, White Plains, New York, 10604. On information and belief, Sabra's members are Frito-Lay Dip Company, Inc. (which is incorporated under the laws of Delaware with its principal place of business in Texas) and S.E. USA, Inc. (which is incorporated under the laws of Delaware with its

principal place of business in New York). Sabra is therefore a citizen of Delaware, Texas, and New York. Sabra is not a citizen of Connecticut.

9. Sabra's registered agent in New York is CT Corporation System, 28 Liberty Street, New York, NY 10005.

### JURISDICTION AND VENUE

10. This Court has diversity subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between the parties. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). An actual and ripe controversy has arisen between the parties about rights and obligations under an insurance policy.

12. Sabra is subject to personal jurisdiction in New York. Sabra has its principal place of business in this District. The insurance policy in question was issued to Sabra at its headquarters in this District.

13. Venue is proper under 28 U.S.C. § 1391(b). Sabra is subject to this Court's personal jurisdiction and therefore resides in this District. In addition, a substantial part of the events giving rise to this civil action occurred within this District because the insurance policy in question was issued to Sabra at its headquarters in this District.

### FACTUAL ALLEGATIONS

**A.    The Policy**

14. Hartford issued a commercial property insurance policy, No. 46PEGAF2TDT, to Sabra for the policy period that began March 27, 2022, and ends on March 27, 2023 ("the Policy"). A true and correct copy of the Policy is attached to this Complaint as **Exhibit A**.

15. In the Policy, the terms "we," "us," and "our" refer to Hartford, and the terms "you" and "your" include Sabra.

16. As a general matter, the Policy provides insurance coverage—subject to its terms, conditions, and limitations—for direct physical loss of or damage to covered property. Section I.A of the Policy is titled "Insuring Agreement," and it states:

> We will pay for all risks of direct physical loss or damage by a **Covered Cause of Loss** to Covered Property at an **Insured Premises** (or within 1,000 feet thereof) and while such Covered Property is in the Coverage Territory.

(Form PEG 00 11 01 20, at 1.)

17. The Policy defines "Covered Cause of Loss" as "direct physical loss or damage that occurs during the policy period unless the loss or damage is excluded under this Policy." (Form PEG 00 11 01 20, at 33.)

18. Section III of the Policy also contains certain "Time Element" coverage provisions. As a general matter, Time Element coverage provides—subject to the Policy's terms, conditions, and limitations—certain insurance coverage for loss of Business Income due to direct physical loss of or damage to covered property.

19. Section III.A of the Policy is titled "Time Element Coverage," and Section III.A.1 of the Policy states:

> We will pay for the actual loss of **Business Income** you sustain due to the necessary interruption of your business operations during the **Period of Restoration**, due to direct physical loss or damage to property caused by or resulting from a **Covered Cause of Loss** at an **Insured Premises**.

(Form PEG 00 11 01 20, at 19.)

20. Section III.B of the Policy contains certain "Time Element Coverage Extensions," including an "Extended Income" provision in Section III.B.7. That "Extended Income" provision

states, in part:

> **a.** If the necessary suspension of your operations produces a **Business Income** loss payable under this Policy, we will pay for the actual loss of **Business Income** you sustain during the period that:
> **(1)** Begins on the date property is actually repaired, rebuilt or replaced and business operations are resumed; and
> **(2)** Ends on the earlier of:
> **(a)** The date you could restore your business operations, with reasonable speed, to the level which would generate the **Business Income** amount that would have existed if no direct physical loss or damage had occurred; or
> **(b)** The number of consecutive days (shown in the Declarations) after the date determined in **(2)(a)** above.

(Form PEG 00 11 01 20, at 21.)

21. The number of days shown in Policy Declarations for "Extended Income" coverage is "180 day(s)." (Form PEG 00 02 01 20, at 9.)

22. Section VI.D of the Policy defines "Business Income" as follows:

> **Business Income** means:
> 1. Net Income (Net Profit or Net Loss before income taxes), including **Rental Value** and Royalties, that would have been earned or incurred;
> 2. Continuing normal operating expenses incurred; and
> 3. **Ordinary Payroll,** unless otherwise excluded in the Declarations.
> 4. For research and development operations, **Business Income** also includes awarded contract revenues, licensing fees, consulting fees, funding grants and progress (milestone) payments.
> 5. As respects all insureds if you are operating at a Net Loss, continuing normal operating expenses will be offset by the Net Loss.

(Form PEG 00 11 01 20, at 32–33.)

23. Section VI.II of the Policy defines "Period of Restoration." That definition states,

in part:

> **Period of Restoration** means:
> 1. The period of time that:
>    a. Begins at the time the **Covered Cause of Loss** occurred; and
>    b. Ends on the earlier of:
>       (1) When your operations resume;
>       (2) The certificate of occupancy has been obtained from the proper authority or the building is tenantable;
>       (3) The date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
>       (4) The date when business is resumed at a new permanent location.

(Form PEG 00 11 01 20, at 37.)

24. The Policy includes exclusions and other provisions that limit coverage.

25. For example, Section II.B.1 of the Policy contains a "Loss of Market" exclusion that applies to all coverages under the Policy. That "Loss of Market" exclusion states:

> We will not pay for loss or damage caused by, resulting from, or arising out of delay, loss of use, or loss of market.

(Form PEG 00 11 01 20, at 16.)

26. Section III.C.2 of the Policy also contains an "Idle Periods" exclusion that applies to all Time Element coverages in the Policy. That "Idle Periods" exclusion states:

> We will not pay for any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:
> a. Physical loss or damage not insured by this Policy on or off of the **Insured Premises**;
> b. Planned or rescheduled shutdown;
> c. Strikes or other work stoppage; or
> d. Any reason other than direct physical loss or damage insured under this Policy.

(Form PEG 00 11 01 20, at 23.)

27. The Policy also requires Sabra to cooperate with Hartford in the investigation and settlement of any claim, to permit Hartford to examine Sabra's books and records as often as may be reasonably required, and to resume all or part of its business operations as quickly as possible. (Form PEG 00 11 01 20, at 32.)

**B.   Sabra's Hummus Production**

28. Sabra produces hummus at a production facility in Colonial Heights, Virginia ("the Plant"). The Plant is Sabra's sole hummus-production facility, and almost all hummus sold by Sabra is produced at the Plant.

29. In March 2021, Sabra issued a Class I recall of hummus. According to the United States Food and Drug Administration ("FDA"), a sample of Sabra hummus collected at a retail location was found to contain *Salmonella enterica*.

30. Beginning in the Fourth Quarter of 2021 ("4Q 2021"), Sabra's three-month rolling average of hummus production began to decline.

31. On December 1, 2021, the FDA issued a Warning Letter (CMS #615938) to Sabra. The text of that Warning Letter, as obtained from the FDA's public website, is attached as **Exhibit B**. That Warning Letter highlighted that the FDA's inspection of the Plant found serious violations of Current Good Manufacturing Practice standards.

32. After receiving the Warning Letter, Sabra shut down the Plant from December 21, 2021, until January 3, 2022, and Sabra created new cleaning and testing protocols. For example, Sabra changed its cleaning-cycle frequency from every 120 hours to every 60 hours, which would increase the number of interruptions in production and would decrease throughput.

33. Sabra resumed production in January 2022 with new cleaning and testing protocols in place. Those new protocols, however, created "bottlenecks" in production, and both production and sales were diminished in January and February 2022.

34. In March 2022, Sabra discovered contaminated product, and it shut down the Plant on March 26, 2022, to conduct a "deep clean." The Plant remained closed through March 31, 2022.

35. Changes in production that were implemented or occurred in the First Quarter of 2022 ("1Q 2022") led to low output for 1Q 2022. Sabra in fact anticipated that it would produce less hummus during this period.

36. Because of circumstances in 4Q 2021 and 1Q 2022, Sabra's customers (such as grocery stores) bought and sold hummus from other sources, Sabra lost market share, and Sabra's future sales prospects were reduced. Retail stores do not want empty shelves, so if a producer does not meet expectations or demand, the store will give that producer's shelf space to a competitor.

37. In addition, customer preference is shifting more toward lower-cost "private label" (also known as "store brand") products. That has also eroded Sabra's market share.

C. **Water Leak and Elective Upgrades**

38. On April 1, 2022, Sabra discovered a leak in a water pipe at the Plant ("the Water Leak").

39. Sabra ultimately repaired the Water Leak. But while Sabra repaired the Water Leak, it also elected to perform simultaneous upgrades on the Plant, resulting in a longer repair timeline. Without those elective upgrades, the repairs and remediation for the Water Leak would have been completed on or before July 15, 2022. With those elective upgrades, the project was completed on August 23, 2022. The elective upgrades were not covered under the Policy, and neither was Sabra's loss of income during the elective-upgrades period.

40. The Plant reopened at full operational capacity on August 23, 2022. On August 24, 2022, however, Sabra received notice of yet another contamination issue. As a result, Sabra shut down the Plant for another "deep clean."

41. Sabra resumed operations at the Plant on August 27, 2022. All production lines at

the Plant were fully operational at that time.

**D.     The Claim**

42.     On April 4, 2022, Sabra reported the Water Leak to Hartford, and it sought insurance benefits for the Water Leak from Hartford under the Policy ("the Claim"). No other insurance policy issued by Hartford applies to the Claim.

43.     Hartford promptly assigned an adjuster to the Claim, and Hartford has adjusted the Claim diligently and in good faith at all times.

44.     Hartford has paid the total covered cost to repair and remediate covered physical loss or damage at the Plant, less the applicable Policy deductible.

45.     The dispute between Sabra and Hartford centers on Time Element coverage and alleged loss of Business Income. According to Sabra, the Water Leak caused Sabra to lose income.

46.     Subject to a complete reservation of rights, Hartford advanced $20,000,000.00 to Sabra on June 3, 2022. Hartford continued to make progress payments based on estimates and projections while it continued its investigation. At this time, Hartford has now paid a total of $32,549,840.80 to Sabra in connection with the Claim.

**E.     The Parties' Positions**

47.     In essence, Sabra has contended that Hartford should assume that but-for the Water Leak, Sabra's hummus production and sales in 2022 would have been the same as Sabra's hummus production and sales in 2021. Sabra also contends that Time Element coverage should pay for the difference from that straight-line projection.

48.     But although Sabra's 2022 income was less than its 2021 income, that reflects, and largely results from, events and circumstances unrelated to the Water Leak—such as Sabra's low production and sales in 4Q 2021 and 1Q 2022, production "bottlenecks," elective Plant upgrades, unplanned Plant shutdowns, competition, the shift by customers to lower-cost "private label"

products, and loss of market share.

49. The Period of Restoration for the Water Leak was also short—and has ended. After the Water Leak, Sabra resumed partial operations on April 28, 2022. If Sabra had not elected to perform upgrades at the Plant, then it could have returned to full production capacity on or before July 15, 2022. And Sabra actually resumed full operations at the Plant on August 23, 2022, only to have to immediately shut down for four more days due to another contamination issue.

50. Coverage under the "Extended Income" provision in Section III.B.7 of the Policy is also limited, and it does not provide the coverage that Sabra says it does. As of August 23, 2022, Sabra could have restored its business operations, with reasonable speed, to the level that would have generated the Business Income amount that would have existed if the Water Leak had not occurred. Whether Sabra actually restored its operations to that level is irrelevant.

51. Under the Policy's "Loss of Market" exclusion, Hartford does not owe benefits for any loss or damage caused by, resulting from, or arising out of Sabra's loss of market share.

52. Under the Policy's "Idle Periods" exclusion, Hartford also does not owe any Time Element coverage for a stoppage or slowdown in production not caused by the Water Leak itself. Thus, for instance, production "bottlenecks" due to changes in cleaning protocols, or slowdowns in production due to changes in demand, are not covered under the Time Element provisions.

53. Under the circumstances, and based on the terms of the Policy, the total coverage available under the Policy for the Claim is less than what Hartford has already paid to Sabra.

54. There is no additional coverage available to Sabra under the Policy, and Sabra has no other policy of insurance from Hartford that could cover the Claim.

55. Harford, however, is informed and believes that Sabra still contends Hartford owes additional payments under the Policy in connection with the Claim.

56. As a result, a justiciable controversy exists between the parties as to their rights and obligations under the Policy.

## COUNT ONE: DECLARATORY JUDGMENT

**(Declaration of No Additional Coverage)**

57. Hartford repeats and incorporates the allegations in paragraphs 1–56 as if fully set forth in this paragraph.

58. Hartford has no duty to make any additional payments to Sabra in connection with the Claim. This is true for at least the following reasons:

   a. Hartford has paid all covered costs to repair and remediate physical loss of or damage to the Plant.

   b. The Period of Restoration ended on July 15, 2022.

   c. As of August 23, 2022, Sabra could have restored its business operations, with reasonable speed, to the level that would have generated the Business Income amount that would have existed if the Water Leak had not occurred.

   d. The Policy's "Loss of Market" exclusion applies.

   e. The Policy's "Idle Periods" exclusion applies.

59. An actual and justiciable controversy presently exists between Sabra and Hartford about Sabra's coverage under the Policy. The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment. The issuance of declaratory relief by this Court will terminate some or all of the existing controversies between the parties.

60. Hartford therefore seeks, and is entitled to, a judicial declaration that Sabra has no additional coverage for the Claim under the Policy, or under any other policy of insurance issued by Hartford.

## COUNT TWO: DECLARATORY JUDGMENT

### (Declaration of Overpayment)

61. Hartford repeats and incorporates the allegations in paragraphs 1–56 as if fully set forth in this paragraph.

62. Hartford has paid $32,549,840.80 to Sabra. The amount covered by the Policy for the Claim is less than what Hartford has paid. Hartford has therefore overpaid Sabra in connection with the Claim.

63. Under the circumstances, Hartford does not owe any benefits under the "Extended Income" provision in Section III.B.7 of the Policy. But even if Hartford did owe those benefits for the maximum 180 days under that provision, Hartford has *still* overpaid Sabra in connection with the Claim.

64. An actual and justiciable controversy presently exists between Sabra and Hartford about the extent of Hartford's payment obligations under the Policy and Sabra's coverage under the Policy. The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment. The issuance of declaratory relief by this Court will terminate some or all of the existing controversies between the parties.

65. Hartford therefore seeks, and is entitled to, a judicial declaration that Hartford has paid Sabra more than any amount for which coverage is available from Hartford for the Claim.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Hartford Fire Insurance Company asks that judgment be entered in its favor and against Defendant Sabra Dipping Company, LLC, and asks for the following relief:

A. A judicial declaration that there is no additional coverage for the Claim under the Policy, or under any other policy of insurance issued by Hartford;

B. A judicial declaration that Hartford has paid Sabra more than any amount for which

    coverage is available from Hartford for the Claim;

C. For costs of suit incurred in this civil action, according to proof; and

D. Such other, further, or different relief to which Hartford may be entitled.

## JURY DEMAND

Hartford demands a trial by jury on all issues so triable.

                  Respectfully submitted,

Dated: March 2, 2023         /s/ *John M. Hintz*
                     John M. Hintz
                     MAYNARD COOPER & GALE, P.C.
                     551 Fifth Avenue, Suite 1600
                     New York, NY 10176
                     T: (646) 609-9280
                     F: (205) 254-1999
                     jhintz@maynardcooper.com

                     Christopher C. Frost (*pro hac vice* intended)
                     Joshua R. Hess (*pro hac vice* intended)
                     Caleb C. Wolanek (*pro hac vice* intended)
                     MAYNARD COOPER & GALE, P.C.
                     1901 Sixth Avenue North, Suite 1700
                     Birmingham, AL 35203
                     T: (205) 254-1000
                     F: (205) 254-1999
                     cfrost@maynardcooper.com
                     jhess@maynardcooper.com
                     cwolanek@maynardcooper.com

                     *Counsel for Plaintiff*
                     *Hartford Fire Insurance Company*